SPRINGSTEEN et al. v. LEWIS.

(Circuit Court of Appeals, Ninth Circuit. July 7, 1919.)

No. 3150.

1. **Principal and Agent** ⟨⟩102(1)—Power of Agent—Employing Subagent.

Under a general power of attorney to conduct and prosecute all the principals' business and dispose of all their property, the agent can employ another to find a purchaser for real estate; the net price being fixed.

2. **Principal and Agent** ⟨⟩171(1)—Ratification of Agent's Act.

Agent's act in entering into an optional agreement is ratified by the principal accepting from the agent and retaining money with full knowledge that it had been received on such an agreement.

3. **Evidence** ⟨⟩410—Oral Contract—Subsequent Writing—Effect.

A writing to evidence defendants' oral employment of plaintiff to negotiate an optional sale, made long after such oral agreement, and after plaintiff had made a sale and money had been received thereunder, though using the word "sale" instead of optional agreement or optional sale, not being intended to control or supersede the original contract, did not have that effect, and did not estop plaintiff to show the real contract.

4. **Brokers** ⟨⟩67(1)—Commissions from Both Parties.

Defendants' general agent S., being authorized by them to sell for $23,000 and retain as compensation any amount received in excess of $23,000, and he having employed plaintiff to find a customer, S., and plaintiff to divide any such excess, the fact that plaintiff was to receive a commission from G., obtained as a customer, for reducing the price to $30,000, a thing not affecting defendants, did not deprive him of right to recover his commission from them.

5. **Brokers** ⟨⟩42—Necessity of License.

Relative to right of plaintiff employed by defendants to find a purchaser for their real estate to recover a commission, he was not a "broker," required by Comp. Laws Alaska 1913, § 2569, to take out a license, being a merchant, and never having attempted any other real estate sale.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Broker.]

6. **Continuance** ⟨⟩14(2)—Amendment of Complaint—Materiality as to Adverse Party.

As defendants, according to their contention, knew nothing of any contract between their agent and plaintiff, suing for commission for obtaining a customer pursuant to contract with said agent, there was no error in denying a continuance when plaintiff was allowed to amend his complaint by inserting the word "optional" before the word "sale" wherever appearing in the complaint.

Ross, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Second Division of the District of Alaska; J. R. Tucker, Judge.

Action by S. L. Lewis against W. L. Springsteen and another. Judgment for plaintiff, and defendants bring error. Affirmed.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The defendant in error was the plaintiff in the court below, and the parties here will be designated as in that court. The defendants were the owners of mining property in Alaska. They had given a general power of attorney to H. H. Springsteen, in which was included the power to purchase lands, and to lease, let, demise, bargain, sell, release, convey, mortgage and hypothecate lands and tenements and hereditaments upon such terms and conditions and under such conveyances as he shall think fit, and to make, do, and transact all and every kind of business of what nature and kind soever, and further power to execute all such instruments as may be necessary and proper in the premises.

The complaint alleges that on or about September 28, 1912, the defendants, through their said agent, orally agreed with the plaintiff that he should negotiate for them an optional sale of three mining claims owned by them in Alaska upon terms that would net to the defendants $23,000, and that any sum realized over and above said amount should be paid the plaintiff as his compensation, and that he should be paid out of the first payments, and that, if all payments were not made, then the amounts received should be divided until he received his full compensation; that thereafter on October 29, 1912, the plaintiff secured one H. Greenberg to take a written option of purchase of said claims in the name of H. Robinson, his partner, for the sum of $30,-000, payable in installments, and on January 11, 1913, Greenberg paid under the option $5,000, to the defendants; that in June, 1913, in an attempt to confirm and to evidence the terms of the prior oral agreement between the defendants and the plaintiff a written memorandum of agreement was made between the plaintiff and the agent; that Robinson defaulted in further payments; that the defendants refused to pay the plaintiff his one-half of the amount which they received. The plaintiff demanded judgment for $2,500.

The defendants in their answer alleged that the said acts of their agent were without authority, that the agreement which the agent made with the plaintiff was made with intent to defraud the defendants, and that the plaintiff on January 7, 1913, entered into a collusive agreement with Greenberg for a commission from him, which agreement was inconsistent with his duties towards the defendants. They admitted the receipt of the $5,000 payment, but denied that the same was paid by reason of any act or thing done by the plaintiff. The jury found for the plaintiff, and judgment was rendered thereon against the defendants in the sum of $2,500.

O. D. Cochran and G. J. Lomen, both of Nome, Alaska, and Griffin & Griffin, of Seattle, Wash., for plaintiffs in error.

William A. Gilmore, of Seattle, Wash., and T. M. Reed, of Nome, Alaska, for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). [1, 2] The defendants contend that the power of attorney was not sufficiently broad in its scope to authorize their agent to employ the plaintiff, and they cite authorities to the doctrine that a broker with special authority to sell real estate has no implied power to delegate his authority to another or to employ a subagent. Here there was no delegation of authority other than the employment of a subagent to do a certain designated act, and under a general power of attorney such as that here involved, which was a power to conduct and prosecute all of the principals' business and to dispose of all their property, it is well settled that the agent has power to employ another to find a purchaser for the principals' real estate. "An agent authorized by the owners to sell lands may, having exercised his own discretion as to price and terms, after an examination of the property, delegate to

his subagent authority to find a purchaser." 2 C. J. 689; Renwick v. Bancroft, 56 Iowa, 527, 9 N. W. 367; Gold v. Serrell, 6 Misc. Rep. 124, 26 N. Y. Supp. 5. At the time of the contract between the plaintiff and the defendants through the latter's agent, the defendants were outside of Alaska, and so remained for a considerable period of time. When the $5,000 was paid to the agent, he turned it over to the defendants. He had already notified them of the option to Greenberg, and he testified that in 1913 he sent them a copy of the option. By accepting and retaining the $5,000 with full knowledge that the same had been received upon an optional agreement, the defendants ratified the act of their agent in entering into that agreement. Senger v. Malloy, 153 Wis. 245, 141 N. W. 6; Johnson v. Ogren, 102 Minn. 8, 112 N. W. 894.

[3] At the close of the testimony the defendants moved for an instructed verdict in their favor on the ground that the plaintiff had failed to make out a case. They contend that under the agreement between the agent and the plaintiff there can be no recovery, and they say that the agreement clearly contemplated a sale and not an option. The plaintiff's evidence was in substance that the agreement was oral, and that he induced Greenberg to take on October 29, 1912, an option on the mining claims under the agreement as alleged in the complaint, and that on January 11, the $5,000 was paid; that he demanded of the agent his proportion of that payment, and the agent made excuses for delay, and asked the plaintiff to wait until the defendants came to Alaska in June. He further testified that, for the purpose of putting his oral agreement into a written form, the plaintiff, in June, 1913, induced the agent to execute the written agreement which was antedated as of September 28, 1912, the date of the oral agreement. Now, the written agreement adopts the word "sale" instead of optional agreement or optional sale, and it does not in fact exhibit the actual oral agreement between the plaintiff and the agent, as so testified to by the plaintiff, and it was not intended and it should not be held as a matter of law to control or supersede the original contract under which the plaintiff acted and under which the $5,000 payment had been made. The written agreement was made long after the date of the oral agreement, and long after the optional agreement was obtained, and payment was made thereunder, and it does not have the effect to estop the plaintiff to state the truth of the matter. The court below fairly instructed the jury on this feature of the case and charged them that the plaintiff could recover only in case they found that the defendants through their agent authorized him to enter into or negotiate an optional contract, and that he was instrumental in securing Greenberg to enter into the same. But the court also charged the jury that if they found that the written agreement duly evidenced the agreement between the parties, and the defendants, their verdict must be for the defendants.

[4] There was evidence to show that the plaintiff expected a commission, not only from the defendants, but from Greenberg. For that reason the defendants contend that the plaintiff cannot recover. The court properly, we think, instructed the jury to the effect that a gen-

eral agent cannot act as such for both parties to the same transaction in matters which involve the exercise of discretion where the interests of the parties are conflicting, and that, if he does, he cannot recover any commission from either unless he does so with the knowl‧edge and consent of both, and that, if a broker merely brings together the parties to a sale and they themselves settle the terms or complete the deal, he acts as a middleman and may accordingly recover commission from each party if each has promised it. The evidence was that the defendants before leaving Alaska had fixed for the mining claims a price which they communicated to their agent. That price was $23,000. The agent informed the plaintiff that the sale must net $23,000 to the defendants. What contract, if any, the defendants had with their agent as to commissions or compensations, is not shown. The agent acted upon the theory that he was entitled to receive as his commission all that was realized over and above the net price so fixed. There is no evidence that he was not authorized to do this. He and the plaintiff intended to divide commissions. The first price mentioned to Greenberg was $35,000. He offered to pay the plaintiff $2,500 if the price fixed in the option could be reduced to $30,000. The plaintiff testified that he communicated this offer to the agent, and that agent consented to reduce the price to $30,000. Now, if it was true, as the evidence indicates, that the agent was authorized to retain as his commission all that he could obtain for the property over and above $23,000, he and the plaintiff in reducing the price in the option were dealing with a matter which pertained to themselves only, and did not affect the defendants, and in entertaining the offer of Greenberg to pay him $2,500 the plaintiff was not acting in hostility to the defendants' interests. In view of all the evidence, we are not convinced that the court erroneously instructed the jury on this branch of the case, or that recovery should be denied the plaintiff on the ground that he acted in a double capacity in the transaction.

[5] We find no merit in the contention that the plaintiff is not entitled to recover a commission for the reason that he had no license as a broker under section 2569, Compiled Laws of Alaska. The plaintiff was not engaged in the business of a broker. He was a merchant, and there is no evidence that he ever attempted to make a sale of real estate other than that which is here involved. In 9 C. J. 513, it is said:

"One who, while engaged in other business, makes a single or occasional sale, or other transaction for another, under a special contract, is not a broker, and is not required to take out a license as such." Smith v. Sharpe, 162 Ala. 433, 50 South. 381, 136 Am. St. Rep. 52; O'Neill v. Sinclair, 153 Ill. 525, 39 N. E. 124; Pope v. Beals, 108 Mass. 561; Woods v. Heron, 229 Pa. 625, 78 Atl. 1128; Johnson v. Williams, 8 Ind. App. 677, 36 N. E. 167.

[6] Also without merit is the contention that it was error to deny the defendants' motion for a continuance when on the trial the court permitted the plaintiff to amend his complaint and insert the word "optional" before the word "sale" wherever the word "sale" appeared. The original complaint is not before us, and we have no information of its contents. It appears from the motion for a new trial that the

amendment was claimed to be an abuse of discretion. It is inconceivable that the defendants could have been in any way injured by the amendment. According to their contention, they knew nothing of any contract between their agent and the plaintiff, and could have furnished no testimony on the issues so changed, if they were changed, by the amendment.

We find no error.

The judgment is affirmed.

ROSS, Circuit Judge (dissenting). From the judgment of affirmance in this case I respectfully dissent. The second amended complaint upon which the action was tried in the court below, and upon which recovery was there had by the plaintiff, alleges, among other things:

That on or about September 28, 1912, the defendants to the action, through their authorized agent in writing, one H. H. Springsteen, entered into an oral contract with the plaintiff Lewis, by which he was employed "as their sole agent or broker in negotiating for the optional sale of certain placer mining claims (specifically described) owned by them."

That thereafter, and on or about the ——— day of June, 1913, "in confirmation of said oral agreement and to evidence the terms thereof, the plaintiff and defendants, by and through their said agent, signed, executed, and delivered a written contract, a copy of which is attached hereto and made a part hereof and marked 'Exhibit A,' which said contract was by mutual consent dated as of September 28, 1912, the date of the original agreement aforesaid."

In view of those express allegations of the complaint, it is manifest that we must look to the said exhibit to see what the contract between the plaintiff and the defendants was, and which contract must, of course, govern the rights and obligations of the respective parties thereto.

Omitting the description of the property, consisting of mining claims in the Cape Nome mining district of Alaska, the written contract is as follows:

"That W. L. Springsteen and Ernest Hester have this day placed with S. L. Lewis, of Nome, Alaska, as their sole agent, for sale, in consideration of the said S. L. Lewis efforts to sell the same the following described placer mining claims. * * *

"The price for said three mining claims to be twenty-three thousand ($23,-000) dollars. The said W. L. Springsteen and Ernest Hester hereby authorize the said S. L. Lewis to sell said named property to any purchaser he may desire, and the said S. L. Lewis, to whom the exclusive right of making this sale is given, shall retain and receive for his efforts in making a deal, such sum or sums of money as he may get over and above said stipulated sum of twenty-three thousand dollars, but he shall not be entitled to any other commission in the event of making a sale. The said W. L. Springsteen and Ernest Hester to receive for their above-named property the net amount of twenty-three thousand dollars, and the said S. L. Lewis to receive for his share in making a deal, all money over and above said twenty-three thousand dollars, for which the property is sold.

"It is hereby agreed that such amount as may be due the said S. L. Lewis shall be paid out of the first payment made on the sale of said property, and in the event of purchaser not making final payments and the sale not being accomplished, said S. L. Lewis agrees to pay half of the money so received as his share of the profits of the sale to said W. L. Springsteen and Ernest Hester."

The defendants to the action, who are plaintiffs in error here, contend that the powers of attorney under which H. H. Springsteen executed on their behalf the contract with Lewis were not broad enough in their scope to confer that power upon him; but I assume, for the purpose of our decision, that they were. Under that assumption, the plaintiffs in error authorized the defendant in error to sell the property and to retain for his services in so doing all he might get therefor over and above $23,000, which sum of money the plaintiffs in error should receive for the property; it being expressly declared that the agent (Lewis) should "not be entitled to any other commission in the event of making a sale," and it being further expressly agreed between the respective parties:

"That such amount as may be due the said S. L. Lewis shall be paid out of the first payment made on the sale of said property, and in the event of purchaser not making final payments and the sale not being accomplished, said S. L. Lewis agrees to pay half of the money so received as his share of the profits of the sale to said W. L. Springsteen and Ernest Hester."

It is conceded that the optional purchaser secured by Lewis—one Greenberg—paid only $5,000 thereon, and, after one extension of the option, abandoned it. It was for one-half of the $5,000 so paid that Lewis brought the suit.

It is, I think, obvious from the terms of the contract that he is entitled to no part of that money: First, because it is expressly declared thereby that "he shall not be entitled to any other commission in the event of making a sale" than such sum or sums as he should get over and above the $23,000 that were to go to the owners of the property therefor; and, secondly, because of the concluding clause of the contract above quoted, in these words:

"In the event of purchaser not making final payments and the sale not being accomplished, said S. L. Lewis agrees to pay half of the money so received as his share of the profits of the sale to said W. L. Springsteen and Ernest Hester."

If that clause can be construed to mean anything, it surely cannot be held to impose any obligation upon the owners of the property to pay him any portion of the $5,000.

Moreover, the testimony of both Lewis and H. H. Springsteen clearly shows that they combined to perpetrate such a gross fraud upon the owners of the property as, in my opinion, no court of justice should sanction by its judgment. A few extracts from the testimony of each of them will be enough to show this to be true.

H. H. Springsteen, being asked to state fully how it was that he signed the contract, answered:

"Well, it was this way: This $5,000 had been paid, and I expected that there might be some trouble in my getting some commission out of it, and Mr. Lewis suggested he draw up some kind of an agreement, and so this agreement was signed as a friendly proposition. I should take one half of the money and the other half should be paid to the principals, to Springsteen and Hester, and I should keep one half of it. This money was to be given to him because I was the attorney in fact, and he was my friend and was going to give it back to me.

"Q. And that was the reason this was signed? A. The only reason, so far as I know; I didn't know at the time I signed the agreement that it was

dated back; if I had, I wouldn't have executed it at that time. I did not order Billy Moore or procure Billy Moore to antedate it and to put his certificate on there that it was signed September 28, 1912. I never discussed the matter with Billy Moore at all. I was only in his office about a minute. I presume Mr. Lewis procured Billy Moore to draw up this instrument; I didn't. Mr. Lewis asked me to go over to Billy Moore's and sign it, and when I went over there it was all drawn up and ready to sign. I was only in Billy Moore's office once. * * * I never intended to rob anybody. I considered myself entitled to $2,500, and in order to get it I got Mr. Lewis to enter into this agreement to cover the money up in some way so the defendants couldn't get it. Mr. Lewis didn't have a dollar of it coming, and I never promised him one cent of it. I did not pay Billy Moore for drawing up that agreement; if Mr. Lewis did, that is up to him to tell why. I was the only one interested in that agreement, and it was drawn up for the sole purpose to try and get this money away from my own brother. That is a fact; yes, sir.

"Q. And do you mean to tell the court and jury in negotiating this deal Mr. Lewis never had anything to do with it at all? A. I never said so. I don't want them to understand that. I claim I negotiated the deal myself in the summer; the reason Mr. Lewis was going to see Mr. Greenberg about it was that he was helping me out simply as a friend. I never expected he would claim this money. * * * The reason I did not write to the defendants about the Greenberg option as soon as the money was deposited to their credit at the Miners' & Merchants' Bank was because I didn't care to write to them. * * *

"Q. Did Mr. Springsteen or Mr. Hester threaten to prosecute you for keeping this money, or trying to keep it? A. I don't think they threatened to prosecute me; they were sore at the time, and I don't blame them."

The defendant in error, plaintiff in the case (Lewis), while taking issue in his evidence with H. H. Springsteen regarding the agreement under which he undertook to and did procure Greenberg to take an option upon the property, and also regarding the circumstances under which he went to the office of Moore and signed the contract in the name of his principals with Lewis, being asked to state what was said at the time of his first employment, answered:

"I told Mr. Springsteen if he give me a chance to handle the ground I think I can handle it on an option to Greenberg; he had tried to handle it himself and he can't do it. He said, 'You know him better, and perhaps you can get him to take an option,' and he told me to go ahead and do it. I asked him what the price was, and he said $23,000—$20,000 for the owners and $3,000 for himself, and all I got above it, if I got anything above it, that would be mine. So that was all right, perfectly satisfied with that. Also, if I should get a payment I like to have my pay on the first payment, out of the first money. 'All right,' he said, 'that is satisfactory. Furthermore if any payment is made and then dropped, what will we do then?' *Then we agreed to divide the money.* He said, '*You take half and I take half.*'" (Italics mine.)

The plaintiff, Lewis, also testified in effect that although, as representing the owners of the property, he asked Greenberg $35,000 for it, he, pending the negotiation, accepted from Greenberg an offer to pay him $2,500 if he could get the price of the property reduced to $30,000.

In my opinion the judgment should be reversed, and the case remanded to the court below, with directions to dismiss the action at the plaintiff's cost.